UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------X
DAVID EKSTEIN, SARA EKSTEIN, GAVRIEL
ALEXANDER,

                Plaintiffs,

     –against–

POLITO ASSOCIATES LLC,

              Defendant.
----------------------------------------------------------------X
POLITO ASSOCIATES LLC,

             Counterclaim-Plaintiff,

     –against–

DAVID EKSTEIN, SARA EKSTEIN, GAVRIEL
ALEXANDER and 9 POLITO LLC,

          Counterclaim-Defendants.
----------------------------------------------------------------X

**OPINION AND ORDER**

20 Civ. 1878 (JCM)

      Plaintiffs David Ekstein, Sara Ekstein and Gavriel Alexander ("Individual Plaintiffs")

commenced this action against Customers Bank ("Defendant")[1] in Rockland County Supreme

Court. (Docket No. 1-1).  On March 3, 2020, Defendant removed the action to this Court,

(Docket No. 1), and filed its answer and counterclaims against the Individual Plaintiffs and 9

Polito LLC ("Borrower") (collectively, "Plaintiffs"), (Docket Nos. 5, 17).  On May 8, 2020,

Plaintiffs answered Defendant's counterclaims. (Docket No. 18)  The Court held a bench trial

---

[1] Customers Bank sold, assigned, transferred and delivered its rights, title and interest in the mortgage note and
related loan documents to Polito Associates LLC. (Docket No. 20 at 2).  Since Polito Associates LLC is the
successor-in-interest to Customers Bank, I will refer to them both as "Defendant."

from April 1 to April 3, 2024.[2]  Following the bench trial, the parties submitted proposed

findings of fact and conclusions of law. (Docket Nos. 125, 126).

>    After due deliberation, it is hereby ordered and adjudged that the following constitutes

the Court's findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure

52(a).

## I.    STANDARD OF REVIEW

>    Rule 52(a) of the Federal Rules of Civil Procedure "provides, in relevant part, that a court

conducting a bench trial 'must find the facts specially and state its conclusions of law

separately,' and that '[j]udgment must be entered under Rule 58.'" *Viera v. United States*, No.

18-cv-9270 (KHP), 2020 WL 5879035, at *2 (S.D.N.Y. Oct. 1, 2020) (quoting Fed. R. Civ. P.

52(a)(1)).

## II.    FINDINGS OF FACT

### A.    Factual Background

>    Since high school, Gavriel Alexander ("Alexander") has worked in real estate. (Trial Tr.[3]

at 353).  He began "buying, fixing, [and] selling" multifamily homes, and later became involved

in commercial real estate. (*Id.* at 353-54).  In 2014, Alexander formed Copper Ridge Holdings

LLC to "assembl[e] the partners, the equity partners, obtain[] financing, [conduct] day-to-day

operations," and "purchase" properties. (*Id.* at 355).  Alexander served as Copper Ridge

Holdings' "managing member." (*Id.* at 354).  The entity took on the name 9 Polito LLC when it

---

[2] The parties consented to this Court's jurisdiction over all proceedings in this matter pursuant to 28 U.S.C. § 636(c) and Fed. R. Civ. P. 73. (Docket No. 23).

[3] "Trial Tr." refers to the transcript of the bench trial held from April 1 through April 3, 2024. (Docket Nos. 132, 134, 136).

purchased 9 Polito Avenue, Lyndhurst, New Jersey 07071 ("Property") in 2015. (*Id.* at 354); (*see also* Docket No. 126 at 5).

The Property was built in 1989. (Docket No. 126 at 5). The lot spans six-and-a-half acres and houses a Class A office building. (*Id.*); (*see also* Trial Tr. at 400-01). The first floor is leasable retail space, the second, third and fourth floors are a parking garage, and floors five through ten each have leasable office space. (Trial Tr. at 294-95, 379-80); (*see also* Docket No. 126 at 5-6). The first floor hosts a large lobby, the ceiling of which extends up to the fifth story of the building. (Trial Tr. at 294-95, 379-80). The rooftop also has leasable space for telecommunications antennae and related equipment. (*Id.* at 423). The Property is in a prime location. (*Id.* at 403). It has "visibility from . . . Route 3, Route 17, 46, 90[,] 80," and the New Jersey Turnpike, has train access to New York City, is close to Newark International Airport and MetLife Stadium, and sits a few miles from the Lincoln Tunnel. (*Id.* at 403-05); (*see also* Pls. Ex. 4 at 13-14). The Property is zoned as Commercial Park. (Def. Ex. L at 7).

Borrower purchased the Property on May 1, 2015, for $50,620,000. (*See* Pls. Ex. 30). On February 17, 2016, Borrower obtained a $42,650,000 loan, secured by a first priority mortgage on the Property, from Defendant. (Def. Exs. A-C; Trial Tr. at 461). The loan was set to mature on March 1, 2018. (Trial Tr. at 409); (*see also* Def. Ex. A at 1). Before extending the loan, Defendant ordered an appraisal of the Property. (Trial Tr. at 367-68). The commercial real estate firm Cushman & Wakefield valued it at $53,000,000, noting that it may increase to $59,100,000 upon the completion of renovations. (Pls. Ex. 31 at 107); (*see also* Trial Tr. at 373) (Alexander noting that "the value is 53 million and then you put in another 5 [million], the value actually jumps to 59 million").

In connection with the loan, Borrower executed a promissory note ("Note"), secured by a first priority mortgage on the Property, and the Individual Plaintiffs executed personal guaranties ("Guaranties").[4] (*See id.*).  Borrower's "goal [in] taking this loan . . . was to have [Ralph Lauren] extend their lease." (Trial Tr. at 409).  Ralph Lauren "occupied approximately 70 percent of the building" when Borrower purchased the Property, but the expiration of their lease was quickly approaching. (*Id.* at 409-11).  Borrower extensively negotiated with Ralph Lauren to extend their lease by offering them the opportunity to expand their presence within the building. (*Id.* at 409).  To buy time, Borrower requested an extension of their loan term with Defendant. (*Id.* at 410-11).  Ultimately, the loan was modified on four separate occasions, (Def. Exs. D-G), during which Borrower kept negotiating with Ralph Lauren, (Trial Tr. at 411).  Despite Borrower's efforts, Ralph Lauren did not extend their lease, and Borrower defaulted on the loan for a fifth time. (*Id.*; Def. Ex. H).  This time, Defendant declined to entertain another loan modification, and issued a notice of default demanding that: (1) Borrower pay a total of $32,243,710.21 under the Note; and (2) the Individual Plaintiffs pay $7,662,500.00 under the Guaranties. (Def. Ex. H); (Trial Tr. at 417-18, 451) (Alexander testifying that Borrower "sold the note [and] put a receiver in [the Property], so [he] lost full control over" it).  Thereafter, Defendant exercised its right to set-off the loan balance by obtaining $2,698,443.00 from a lock-box account. (Trial Tr. at 420-21; Def. Ex. H at 2).

Following Borrower's default, Defendant commenced a foreclosure action in the Superior Court of New Jersey, Chancery Division, Bergen County ("Foreclosure Action").  On

---

[4] One Guaranty was the Renovation Guaranty, which required Borrower to set aside between $4,500,000.00 and $5,000,000.00 to conduct renovations. (Trial Tr. at 381-82).  It was "paid off and discharged when the renovations were completed." (*Id.* at 383).  Borrower renovated the "common areas," including a five-floor lobby, along with "certain bathrooms and elevator[s]," "a new gym[,] cafeteria," and a conference center. (*Id.* at 378-79).  Since the Renovation Guaranty was discharged, "it's not an issue in this case." (*Id.* at 383).

January 7, 2021, Defendant obtained a judgment authorizing and directing that the Property be sold at a sheriff's sale to pay the debt owed to Defendant ("Final Judgment"). (Pls. Ex. 1). While the Foreclosure Action was pending, Customers Bank sold its rights and interest in the Note and related loan documents to Polito Associates LLC, an entity formed by Brian Trematore ("Trematore") and Jack Morris ("Morris"). (*See* Trial Tr. at 248). Trematore and Morris own and manage several properties in New Jersey. (*See generally id.* at 246-50). As Trematore describes it, he is the "sticks and bricks" partner who handles the hands-on work, while Morris is the "money guy." (*Id.* at 251).

On June 11, 2021, a sheriff's sale of the Property took place. (Pls. Ex. 2); (*see also* Trial Tr. at 10) (Plaintiffs' counsel explaining "[t]here is no piece of paper which documents the date of the foreclosure sale itself, so we used . . . the sheriff's deed"). However, since no bid was placed on the Property, it remained with Defendant, who entered a credit bid of $8,000,100.00. (Pls. Ex. 2). In July 2021, Defendant attempted to rezone it from Commercial Park to mixed-use, in an effort to build apartments within the Property and turn a profit. (Trial Tr. at 301-05). However, Trematore and Morris encountered "a lot of issues," most notably that the New Jersey Sports and Exposition Authority denied their request to convert the Property into an apartment building. (*See id.* at 257-60) ("We really thought that we could probably get apartments there, and we were dead wrong."). To make matters worse, the COVID-19 pandemic "crushed" the market for office buildings. (*Id.* at 258-59). Simply put, Trematore and Morris were stuck with "a white elephant," (*id.* at 359), and began to "put a lot of time and effort into redoing [the Property] as office space," (*id.* at 268).

**B.      Procedural History**

In March 2023, the parties cross-moved for summary judgment. (Docket Nos. 57, 60).

The Court granted in part and denied in part each motion.  The Court held: (1) Plaintiffs voided

their limited liability under the Note by transferring their interest in the Property; (2) the

Individual Plaintiffs and 9 Polito LLC are equally liable to Defendant; (3) the Renovation

Guaranty was discharged; (4) an issue of fact remained as to the fair market value of the

Property; and (5) Defendant's Draft Garage Report was inadmissible at trial. (Docket No. 107).

Following summary judgment, Plaintiffs filed various motions *in limine*, (Docket Nos.

65, 90, 94, 97, 100), which the Court granted in part and denied in part.  First, the Court granted

Plaintiffs' motion to bar several witnesses from testifying, except for impeachment purposes, at

trial because Defendant failed to disclose them. (*See* Minute Entry, March 7, 2024).  Second, the

Court denied Plaintiffs' motion to bar Defendant from introducing at trial a belatedly disclosed

final version of its expert report. (*Id.*).  Third, the Court granted Plaintiffs' motion barring

Defendant from introducing evidence of the criminal history of Plaintiffs' expert. (*Id.*).  Fourth,

the Court granted Plaintiffs' motion to bar Defendant from introducing evidence of damages that

conflict with the Final Judgment, and found that the lawful rate of interest to accrue on the Note

was set by New Jersey law. (Docket No. 130).

The Court held a bench trial to decide the fair market value of the Property at the time of

the sheriff's sale.  During the bench trial, four witnesses testified.  Defendant's expert, Christoper

Otteau ("Otteau"), and Defendant Brian Trematore ("Trematore") testified on behalf of

Defendant. (Trial Tr. at 18, 244).  Plaintiff Gavriel Alexander ("Alexander"), and Plaintiffs'

expert, Konstantin Belenky ("Belenky"), testified for Plaintiffs. (*Id.* at 352, 480).  The Court

admitted exhibits from Plaintiffs and Defendant. (*See* Pls. Exs. 1-41; Def. Exs. A-J, L).

After trial, Plaintiffs moved to reopen the record to correct a mathematical error in Plaintiffs' expert report. (Docket No. 127). Citing several criminal cases from courts outside of the Second Circuit, Plaintiffs argue that courts have "inherent authority in [their] discretion to reopen the record," that this Court should do so because there is no prejudice to Defendant, and Plaintiffs only discovered the error after trial. (*See id.* at 2). In response, Defendant argues that Plaintiffs should have discovered the error sooner, that it would be prejudiced by reopening the record without having an opportunity to review and challenge the evidence, and that the correction is minor in significance, thus, reopening the record is a "waste of time." (Docket No. 131 at 1-2).

The Court denies Plaintiffs' motion to reopen the record. Courts in the Second Circuit correct obvious mathematical errors in the process of evaluating evidence. *See, e.g.*, *Windsor Sec., LLC v. Arent Fox LLP*, 16 Civ. 1533 (GBD), 2019 WL 1510895, at *12 n.14 (S.D.N.Y. Mar. 27, 2019) ("Although Plaintiff's expert report calculates its damages for these fees as $103,269, this appears to be a mathematical error, because the legal fees listed total $103,268."); *see also Trustees of the Pavers & Rd. Builders Dist. Council Welfare v. M.C. Landscape Grp., Inc.*, 12-CV-0834 (CBA) (VMS), 2015 WL 12645526, at *24 n.27 (E.D.N.Y. Oct. 16, 2015) ("The Court has also consulted Plaintiffs' submission which corrects mathematical errors in the Remittance Reports and has independently verified that Plaintiffs' corrections are valid."), *report and recommendation adopted sub nom. Trustees of the Pavers v. M.C. Landscape Grp., Inc.*, 2016 WL 1238233 (E.D.N.Y. Mar. 29, 2016). Thus, the Court will correct any obvious mathematical errors in its analysis, and it is not necessary to reopen the record to do so. Accordingly, Plaintiffs' motion to reopen the record is denied.

III.    **CONCLUSIONS OF LAW**[5]

The sole legal issue before the Court is the amount Plaintiffs owe Defendant.  To decide this, the Court must first determine how much principal remained on the Note when Plaintiffs defaulted, and the interest rate at which it accrued under the Final Judgment.  Then the Court must ascertain the fair market value of the Property at the time of the sheriff's sale, and deduct it from the amount owed on the Note.[6]

A.    **Remaining Principal on the Note and Lawful Interest**

The parties agree that Defendant is entitled to any remaining principal on the Note, along with lawful interest. (*See* Docket No. 125 at 8-9); (*c.f.* Docket No. 126 at 2) ("If the fair market value of the property at the time of sale fell short of the [remaining] debt [on the Note], Plaintiffs are liable to [Defendant] for the difference, plus interest at the post-judgment rate.").[7]  However, they do not agree on the amount.  Plaintiffs set forth how they calculated the amount owed, (*see* Docket No. 126 at 13-14), but Defendant does not, (*see generally* Docket No. 125).  After thoroughly reviewing the record, and weighing the credibility of the witnesses and the evidence before it, the Court finds that Plaintiffs owed $36,523,158.12 as of the sheriff's sale.

---

[5] It is undisputed that New Jersey state law governs the substantive law in this diversity action, and federal law governs the procedural law. (*See generally* Docket Nos. 125, 126); *see also Erie R. Co. v. Tompkins*, 304 U.S. 64 (1938).

[6] The parties agree that the fair market value of the Property reduces Plaintiffs' debt, but disagree on how to calculate the Property's fair market value at the time of the sheriff's sale. (*Compare* Docket No. 126 at 2) ("Plaintiffs' deficiency liability is wholly dependent on two disputed issues of fact: (i) the amount owing to the [Defendant] . . . and (ii) the fair market value of the [Property] at the time of the [sheriff's] sale.") (*with* Docket No. 125 at 13-15) (explaining a "fair market value credit").

[7] Before trial, the Court ruled that the parties may not relitigate issues which were "actually litigated" and "necessar[ily]" decided in the Final Judgment. (*See* Docket No. 130).  Thus, the Court made the following rulings: (1) Defendant's damages of "appraisal fees, taxes, exit fees, operating expenses, and receivership fees" were "abandoned" since "Defendant has not submitted any evidence in support of [these] request[s];" (2) the Court will retain its "wide discretion" to award Defendant's attorney's fees; and (3) the default rate of 9.5% set out in the Note does not apply, since the Final Judgment in the Foreclosure Action stated that "lawful interest" applies. (*Id.*).

Here, the Final Judgment states that Defendant is entitled to $35,937,291.39, with accrued "interest at the rate of 9.5% per annum . . . from December 1, 2020 to January 7, 2021," and "lawful interest" thereafter, plus court costs and attorney's fees for the Foreclosure Action. (Pl. Ex. 1 at 3) (cleaned up).  Thus, the Court will calculate: (1) $35,937,291.39, at 9.5% interest per annum, from December 1, 2020 to January 7, 2021; and (2) lawful interest on this amount from January 7, 2021, through the sheriff's sale, plus court costs and attorney's fees from the Foreclosure Action.

First, since the interest from December 1, 2020 to January 7, 2021 accrues "per annum," the Court multiplies $35,937,291.39 by 9.5% to calculate the annual interest, which totals $3,414,042.68.  To calculate daily interest, the Court divides the annual amount by 365, which equals $9,353.54.  Since there are 37 days between December 1, 2020 and January 7, 2021, the Court multiplies the daily interest of $9,353.54 by 37, and finds that $346,081.04 of interest accrued during this time.  Adding $346,081.04 of interest to the Final Judgment amount of $35,937,291.39, the Court calculates Plaintiffs' debt as of January 7, 2021, as $36,283,372.43. (*C.f.* Docket No. 126 at 13).

Second, the Final Judgment further requires Plaintiffs to pay "lawful interest" on their remaining debt after January 7, 2021. (Pls. Ex. 1 at 3).  Under the Final Judgment, lawful interest is governed by New Jersey Rules of Court 4:42-11(a). *See Avatar Cap. Fin., LLC v. Nassau Marina Holdings, LLC*, 2022 WL 1495919, at *2 (N.J. Super. Ct. App. Div. May 12, 2022) (holding that "the lawful interest rate referred to in the final judgment [of foreclosure] is the post-judgment rate specified in Rule 4:42-11(a)").  In 2021, the New Jersey Supreme Court set lawful

interest under this rule at 1.5%.[8]  Thus, between January 7, 2021 and June 11, 2021, $231,120.11 accrued in lawful interest.[9] (*C.f.* Docket No. 126 at 14).  By adding the interest to the principal amount of the Final Judgment, Plaintiffs owed $36,514,492.54, plus $1,165.58 in court costs and $7,500.00 in attorney's fees from the Foreclosure Action. (*See* Pls. Ex. 1 at 3), which totals $36,523,158.12. (*C.f.* Docket No. 126 at 45) (Plaintiffs calculate the "the amount . . . outstanding under the Foreclosure Judgment" as "$36,523,158.12").

Accordingly, Plaintiffs owed $36,523,158.12 at the time of the sheriff's sale on June 11, 2021.

## B.    Fair Market Value of the Property at the Time of the Sheriff's Sale

Next, the Court must decide the value of the Property at the time of the sheriff's sale.  It is undisputed that the fair market value is determined as of the date of the sheriff's sale. *See, e.g.*, *J.F. v. S.F.*, Docket No. A-3733-14T2, 2016 WL 6471312, at *2 (N.J. Super. Ct. App. Div. Nov. 2, 2016) (focusing on the property's value "at the time of the sheriff's sale").  For the following reasons, the Court finds that the as-is metric is the appropriate metric to use to determine the fair market value of the Property.

At trial, the parties presented experts who testified to the "as-is" and "as-stabilized" value of the Property.  Plaintiffs argue that the as-stabilized metric provides the "best reflection" of the Property's fair market value, because it captures the Property's "highest and best use." (Docket No. 126 at 37-44).  Plaintiffs further assert that buyers and sellers of commercial properties focus on the as-stabilized value of the premise since it accurately reflects what investors can expect to

---

[8] *See* N.J. Ct. R. 4:42-11(a)(ii); *see also* POST-JUDGMENT AND PRE-JUDGMENT INTEREST RATES, (https://www.njcourts.gov/sites/default/files/courts/civil/postprejudgmentrates.pdf), (last visited September 19, 2024) (setting the post-judgment interest rate for 2021 at 1.5%).

[9] The amount owed on January 7, 2021 was $36,283,372.43. Multiplying that by 1.5% equals $544,250.59. $544,250.59 divided by 365 equals $1,491.10.  $1,491.10 times 155 days equals $231,120.11.

earn from the Property. (*See* Docket No. 126 at 9-11).  In opposition, Defendant argues that the

as-is metric is appropriate because it captures the Property's true value at the time of the sheriff's

sale since it considers the Property in its current condition, and does not include speculative

factors. (Docket No. 125 at 13-15) (arguing that the Property's value "[should] not be affected by

changes to [it] that may occur several years in the future").

New Jersey courts define "fair market value" as "that sum which the mortgagee

purchaser ought, under all the circumstances, [to] reasonably expect to realize from the acquired

premises either by way of sale in the near future or upon the basis of a permanent investment."

*See Fidelity Union Trust Co. v. Ritz Holding Co.*, 8 A.2d 235, 247 (N.J. Ch. 1939).  Courts focus

on "what a willing buyer would pay a willing seller, neither acting under a compulsion" "at or

about the same time of the inquiry." *Brunswick Bank & Tr. v. Heln Mgmt. LLC*, 181 A.3d 1030,

1038 (N.J. Super. Ct. App. Div. 2018) (citations omitted).  Courts typically disregard how much

a property sold for at a sheriff's sale, as "courts have recognized that sheriff's sales rarely

produce fair market value bids." *Smith v. Lopez*, 304 N.J. Super. 26, 30 (Ch. Div. 1996).  Instead,

"[e]xpert testimony is generally required to determine the fair market value of real property."

*Pansini Custom Design Assocs., LLC v. City of Ocean City*, 407 N.J. Super. 137, 143 (App. Div.

2009).  Nevertheless, "a mortgagee purchaser ought not be compelled to speculate for the benefit

of his debtor-mortgagor." *See Fidelity Union Trust*, 8 A.2d at 241.

The Property's highest and best use is an appropriate consideration for determining its

fair market value.  However, New Jersey law does not define the highest and best use of a

property. *See, e.g.*, *Pansini Custom Design Assocs., LLC*, 407 N.J. Super. at 144 (holding

"[u]ltimately, the fact-finder . . . must weigh and evaluate the experts' opinions, including their

credibility . . . in reaching a reasoned, just and factually supported conclusion"); *c.f. Twp. Of*

*Manalapan v. Gentile*, 242 N.J. 295, 306 (2020) ("To constitute the highest and best use, a use must be 1) legally permissible, 2) physically possible, 3) financially feasible, and 4) maximally productive." (internal quotations and citations omitted)).  In making this determination, the factfinder may consider whether current zoning for the Property affected its value at the time of the sheriff's sale, "but only if there is a reasonable probability that a zoning change would be granted." *Borough of Saddle River v. 66 E. Allendale, LLC*, 216 N.J. 115, 119, (2013) (holding that the factfinder "may not speculate about such a change in a property's use").  Nevertheless, in determining a property's fair market value, the factfinder may consider "the available use and program of future utilization that produces the highest present land value," but only if "that use has a probability of achievement." *Manalapan*, 242 N.J. at 306 (internal quotation and citation omitted).  This comports with the well-established rule that the "projected use" for highest and best use purposes "cannot be remote, speculative or conjectural." *Ford Motor Co. v. Township of Edison*, 127 N.J. 290, 301 (1992) (quoting *Inmar Assocs., Inc. v. Twp. Of Edison*, 2 N.J. Tax 59, 65 (1980)).

At trial, the parties submitted expert reports, defining the as-is and as-stabilized valuation metrics.  First, the as-is valuation metric "estimate[s] . . . the market value of real property in its current physical condition, use, and zoning as of the appraisal date." (Def. Ex. L at 130).[10] Second, the as-stabilized metric estimates the "prospective market value [which] reflects the property's market value as of the time the property is projected to achieve stabilized occupancy." (*Id.* at 140).  Specifically, "[f]or an income-producing property," such as the Property here, "stabilized occupancy is the occupancy level that a property is expected to achieve after the

---

[10] While different dictionaries define market value differently, Defendant's expert testified that "[t]he definition of market value on page 10 [of his report] is how we consider something to be market value." (Trial Tr. at 238).

property is exposed to the market for lease over a reasonable period of time and at comparable

terms and conditions to other similar properties." (*Id.*). Simply put, "[a]s is . . . is your today

value," while "[as] stabilized . . . is a prospective value in the future." (Trial Tr. at 85).

The Court finds that the as-is metric best reflects the fair market value of the Property at

the time of the sheriff's sale. The as-is metric focuses on the "current physical condition, use,

and zoning" of the Property "as of the appraisal date." (Def. Ex. L at 130). Otteau used the "as

is" metric to value the Property "as of" the date of the sheriff's sale because it reflects "the

condition on that date." (Trial Tr. at 238). As he testified:

> As is, as we said before, is your . . . today value. Your stabilized value is a
> prospective value in the future. Right? So, that's not the value as of the [sheriff's
> sale]. . . . Now, if you buy this property, go through all the steps, spend the money,
> get it leased up, you know, get the marketing -- you know, spend that $22 million,
> you can have a property that's worth $50 million.

(*Id.* at 85). Thus, by its definition, the as-is metric focuses on the Property's fair market value

"at the time of the sale." *J.F.*, 2016 WL 6471312, at *2 (internal quotations and citation omitted).

This is consistent with lead real estate appraisal resources, which instruct the Court that "[a] fair

value measurement" must "consider use of the asset that is physically possible, legally

permissible, and financially feasible *at the measurement date*." American Institute of Real Estate

Appraisers, *The Appraisal of Real Estate* 61 (14th ed. 2013) (emphasis added); *see also Highest

and Best Use*, Int'l Valuation Standards (8th ed. 2007). Moreover, New Jersey trial courts rely

on the as-is metric in determining the fair market value of a foreclosed-upon property. *See

Amboy Bank v. Harbor View Ests. Ltd. Liab. Co.*, No. A-3523-19, 2022 WL 619612, at *5 (N.J.

Super. Ct. App. Div. Mar. 3, 2022) (upholding a trial court's decision to bar "testimony

concerning the 'as improved' valuation," as it "was not relevant because the FMV determination

was focused on an 'as is' valuation"), *cert. denied sub nom. Bank v. Harbor View Ests. Ltd. Liab. Co.*, 252 N.J. 129 (2022).

Furthermore, to use an as-stabilized value "would basically be valuing [the property] as if we were talking about [a] hypothetical." (Trial Tr. at 241). Otteau provided a simple and compelling example for why the Court should focus on the as-is metric:

> [It]'s the date of value. [To focus on as-stabilized would be] equivalent to saying, you're buying . . . a piece of land for a million dollars, but you're going to build a $5 million house, and you want the $5 million number now. Well, you didn't build the house yet. So, you really have to relate it to what the property is at that given time.

(*Id.* at 86). Based on the evidence presented, the Court concludes that the as-stabilized metric is not indicative of the Property's fair market value at the time of the sheriff's sale. Plaintiffs' expert focused on the as-stabilized metric because the Property "*would* rent" had it been properly "marketed." (*Id.* 633-34) (emphasis added). However, there is a risk in making this assumption. For instance, in *Amboy Bank*, an expert opined that a property's "as improved" value was $3,930,000, but, when he reassessed the property one year later, the as-is value was only $2,900,000. *See* 2022 WL 619612 at *5. The expert reasoned "that the difference in values were attributed to lower projected unit prices, increased construction costs, and increased property taxes." *Id.* This is why New Jersey courts typically avoid making such assumptions. *See, e.g.*, *NR Deed, LLC v. Rabago*, No. A-2315-21, 2023 WL 3027661, at *4 (N.J. Super. Ct. App. Div. Apr. 21, 2023) (upholding a trial judge rejecting a higher "Zillow estimate," and instead adopting an "as-is" metric, since "the Property is in need of substantial repairs and so the Zillow estimate cannot be said to be an accurate reflection of what a buyer with reasonable knowledge of the relevant facts would be willing to pay under normal market conditions based on all surrounding circumstances") (internal quotations and citation omitted). Furthermore, Plaintiffs' expert agreed

"that the difference between as is and [as] stabilized value is the cost . . . to change the property from the way it was when . . . it started . . . to something that's mostly better," (Trial Tr. at 705), which requires the assumption that the Property will improve.  This assumption is contrary to New Jersey law. *See Brunswick Bank & Tr.*, 181 A.3d at 1032-33; *see also State by Com'r of Transp. v. Silver*, 457 A.2d 463, 467 (1983) (focusing on "the time" and "the date" of a taking to "ascertain [its] value").  Thus, because the Court should not speculate as to the Property's future conditions, it rejects the as-stabilized metric.

In addition, Plaintiffs' fact witness, Alexander, was unable to persuade the Court to adopt the as-stabilized metric.  He testified that "[a]s-is value is . . . for lending purposes," while "[p]urchasers or investors typically . . . rely on a stabilized value." (Trial Tr. at 369).  Alexander explained that purchasers seek to "obtain returns," and in order to calculate the value of an income-producing property, buyers "look at the stabilized value." (*Id.* at 370-71).  First, the Court finds no legal support for Alexander's testimony.  In fact, New Jersey courts have specifically relied on the as-is metric to determine the value of foreclosed-upon properties. *See, e.g.*, *Amboy Bank*, 2022 WL 619612, at *5 ("Because the trial court had to determine the property's FMV as of the sheriff's sale . . . we discern no abuse of discretion in the trial court's decision to focus the evidence on the 'as is' evaluation and preclude cross-examination on 'as improved' valuation.").

Second, to the extent that investors typically rely on as-stabilized valuations, the Court finds that this does not reflect the Property's fair market value at the time of the sheriff's sale.  When New Jersey courts account for the Property's value after the sheriff's sale, it is typically shortly thereafter, involves marketplace data, and only provides some support—not primary, conclusive evidence—for the property's value. *See, e.g.*, *Brunswick Bank & Tr.*, 181 A.3d at

1037 ("The judge also heard testimony from Brunswick Bank's representative that, after its acquisition, Brunswick Bank listed Baldwin for sale for $349,900; that testimony, if true, would appear to corroborate Miller's testimony and provide some insight into Baldwin's value."); *see also MMU of New York, Inc. v. Grieser*, 999 A.2d 1204, 1211 (App. Div. 2010) ("MMU does not dispute that the $1,200,500 for which it sold the Monmouth Beach property shortly after the execution sale represented its fair market value at the time"). Here, however, both experts' as-stabilized valuations employed significant prospective assumptions, including a year-long "lease-up" period. (Trial Tr. at 160). Defendant's expert also characterized a year as an "aggressive" timetable to lease-up the Property. (*Id.*). In fact, Plaintiffs' own expert testified that the building is "still not stabilized." (*Id.* at 636). When pressed on his exact valuation, Belenky stated that he preferred averages and invited the Court to choose a number "somewhere in the middle" of his as-is and as-stabilized valuations. (*Id.* at 639). Put differently, this is not a case where the Property was marketed and sold at a substantially higher value "shortly after" it was sold at the sheriff's sale. *See MMU of New York, Inc.*, 999 A.2d at 1211.

At trial, Plaintiffs' witnesses, Alexander and Belenky, both described the speculative nature of the as-stabilized metric. When asked if the "as stabilized is what you hope to be able to make [on] the property *after* you put some work into it," Alexander responded "[y]es," and further opined that "[i]f the value is 53 million *and then you put in another 5 [million]*, the value actually jumps to 59 million." (Trial Tr. at 373) (emphasis added). Expanding on his example, Alexander also testified that an unwise buyer may purchase a property for $53,000,000.00 and not put money into it, but that this is "not typically done." (*Id.*). Specifically, Alexander testified that "with an income-producing property," buyers must plan to put in money above the purchase price in order "to maintain [the] building[]." (*Id.* at 385-86). This additional cost "gets

incorporated into the purchase price," and buyers can expect a return on their investment. (*Id.* at 386).  Similarly, Plaintiffs' expert stated that "[t]he subject property's office space is predominantly vacant and its finishes are dated," so "office tenant improvements and a leasing campaign are required." (Pls. Ex. 4 at 60).  It is clear that Alexander and Belenky are asking the factfinder to make an assumption that future maintenance, improvements or expansions will improve the value of the Property.  However, these improvements may not increase the Property's value.  Depending on market conditions, the value of the Property may even decrease despite investments in improvements.  In fact, Belenky testified that the Property has still not achieved stabilization, testifying that he "would not use value as stabilized, because [the Property is] worth less," and that he is "100 percent sure it's below the as stabilized" value. (Trial Tr. at 702-03).  As a result, the Court is persuaded that the as-stabilized metric is too speculative and uncertain to fairly reflect the Property's value at the time of the sheriff's sale.  Since the Court cannot base its valuation on a "remote, speculative or conjectural" figure, the Court will not consider the as-stabilized metric. *Ford Motor Co.*, 127 N.J. at 301.

Finally, the as-converted metric is clearly inapplicable.  Plaintiffs failed to introduce any evidence supporting even a remote possibility that the Property can be converted to apartment use, and have not raised it in their post-trial briefing. (*See* Docket No. 126).  Plaintiffs' own expert testified that he would not use "[a]s converted, because based on what I know today. . . with a straight face, I cannot talk about it." (Trial Tr. at 634).

Accordingly, the Court concludes that the as-is metric should be used to determine the Property's fair market value at the time of the sheriff's sale.

C.      **As-Is Value of the Property at the Time of the Sheriff's Sale**

The Court must now decide the as-is value of the Property at the time of the sheriff's sale. The parties presented expert reports with different as-is valuations. Plaintiffs' expert valued the Property at $35,000,000, (Pls. Ex. 4 at 4), while Defendant's expert valued the Property at $28,823,000,[11] (Def. Ex. L at 3).[12] Both experts provided calculations supporting their values, and testified at trial regarding their expert opinions. For the following reasons, the Court finds that the Property had an as-is value of $34,944,388.75 on the date of the sheriff's sale.

1.      **Expert Credibility**

"Expert testimony is generally *required* to determine the [property's] fair market value." *Pansini Custom Design Assocs., LLC*, 407 N.J. Super. at 143 (emphasis added); *see also Kortright Cap. Partners LP v. Investcorp Inv. Advisers Ltd.*, 392 F. Supp. 3d 382, 401 (S.D.N.Y. 2019) (citing *United States v. Bilzerian*, 926 F.2d 1285, 1294 (2d Cir. 1991) (approving the use of expert testimony to "help a [factfinder] understand unfamiliar terms and concepts . . . [p]articularly in complex cases")). Furthermore, "[i]n a bench trial, credibility determinations are the province of the presiding judge." *Chill v. Calamos Advisors LLC*, 417 F. Supp. 3d 208, 229 (S.D.N.Y. 2019). It is "the Court's job to weigh the evidence [and] assess credibility." *Bahrami v. Ketabchi*, No. 05 Civ. 3829 (RMB), 2009 WL 513790, at *9 (S.D.N.Y. Feb. 27, 2009) (cleaned up), *aff'd*, 365 F. App'x 266 (2d Cir. 2010). The Court may find a witness not credible because his testimony is "evasive, inconsistent, contradictory or implausible." *Chill*, 417

---

[11] Otteau refers to this figure as an "as is retrospective." (Trial Tr. at 34). This is because he assessed the Property after the sheriff's sale, thus, it is "considered a retrospective valuation." (*See id.*). Nevertheless, this valuation represents the as-is value of the Property at the time of the sheriff's sale.

[12] At trial, Otteau testified that he bifurcated the Property's as-is value from his valuation of the cell tower in his expert report. (*See* Trial Tr. at 85-86). However, Belenky's as-is valuation included the cell tower. (*See id.* at 88-89). To properly compare the expert reports, the Court combines Otteau's as-is value and cell tower estimations.

F. Supp. 3d at 229.  The Court is also entitled "to credit parts of a witness's testimony despite

discrediting others." *Hyman v. Brown*, 927 F.3d 639, 661-62 (2d Cir. 2019); *see also Pansini*

*Custom Design Assocs., LLC*, 407 N.J. Super. at 143 (holding in the context of fair market value

determinations, the court "may accept some of the expert's testimony and reject the rest")

(internal quotations and citation omitted).  In the context of appraisals, courts have recognized

that the "Uniform Standards of Professional Appraisal Practice . . . constitutes the generally

accepted professional appraisal industry standards," *Fed. Hous. Fin. Agency v. Nomura Holding*

*Am., Inc.*, No. 11cv6201 (DLC), 2015 WL 353929, at *2 (S.D.N.Y. Jan. 28, 2015), *aff'd sub*

*nom. Fed. Hous. Fin. Agency for Fed. Nat'l Mortg. Ass'n v. Nomura Holding Am., Inc.*, 873 F.3d

85 (2d Cir. 2017), and generally rely on experts who follow these standards, *see Joseph P.*

*Carroll Ltd. v. Baker*, 889 F. Supp. 2d 593, 599 (S.D.N.Y. 2012).

In determining the as-is value of the Property, the Court finds Otteau's expert opinion

credible, with minor exceptions. (Def. Ex. L).  Otteau developed his report "in accordance with

the Uniform Standards of Professional Appraisal Practice," (*id.* at 2), and, on direct examination,

cross-examination, and when fielding questions from the Court, Otteau answered questions in a

clear and concise manner.  For example, Otteau added context to his expert report by explaining

why the office rental market was in decline at the time of the sheriff's sale, and how he

integrated this data into his report. (*See* Trial Tr. at 60-61).  He also thoroughly explained the

difficult concept of capitalization, how he calculated it, and the way in which it impacts the value

of the Property. (*See id.* at 72-82, 118-19, 225-30).  In turn, the Court was able to follow Otteau's

analysis and understand his expert opinion.  Furthermore, Otteau effectively handled challenges

to his analysis, including his research methods. (*See, e.g.*, *id.* at 174-76).  Moreover, the Court

has thoroughly reviewed Otteau's expert report, and finds that his analysis is consistent and generally supported by the record.

On the other hand, the Court did not find Belenky persuasive.  Belenky did not provide a roadmap for his expert opinion, struggled to clearly explain concepts, and did not concisely answer questions on direct examination. (*See, e.g.*, *id.* at 630-34)  In particular, Belenky explicitly discredited his own report, testifying that he is "definitely, 100 percent . . . sure that [the Property's value] is above as is, and I'm 100 percent sure it's below the as stabilized, and it's somewhere in the middle." (*Id.* at 703)  As a result, the Court is unable to rely on Belenky's as-is analysis since he discredited it at trial and suggested that the Court should choose a number "somewhere in the middle." (*Id.*)  Therefore, the Court will base its findings primarily on Otteau's analysis.

## 2.    Calculation of As-Is Value

The Court will calculate the Property's as-is value under the income approach.[13]  Otteau explains the income approach in his expert report as follows:

> The Income Approach is based on the proposition that discounted future income to be realized from a property is the basis of market value.  Specifically, the appraiser first determines the gross potential income, which the property is capable of producing.  Allowances for vacancy, credit losses and various expenses are deducted from this gross income so as to indicate a net operating income.  This net income is then converted into a market value estimate through a process known as capitalization.

(Def. Ex. L at 50)  The approach evaluates "what [a buyer is] willing to pay for [the property's] income stream." (Trial Tr. at 72); *see also In re Whitney Lane Holdings, LLC*, No. 08-72076-

---

[13] The experts calculated the Property's as-is value under: (1) the income approach, which values a property based on the income it generates, (Trial Tr. at 72); and (2) the sales comparison approach, which values it in comparison to properties sold around the same time and in the same location, (*id.* at 53).  Here, both experts agree that the income approach should be used.  As Otteau explains, this is "an income-producing property," which was purchased "for its cash flow," so "the income approach is the most appropriate" formula. (*Id.* at 95)  Belenky agrees with Otteau, (*id.* at 97-98, 517), and admits their as-is values are "pretty close" under this formula. (*Id.* at 91)  Therefore, the Court will determine the Property's as-is value under the income approach.

478, 2009 WL 2045700, at *4 (Bankr. E.D.N.Y. July 6, 2009) ("The theory behind the income

capitalization approach is that the value of the property is the present worth of future benefits to

an investor.").  To arrive at an as-is value under this approach, Otteau: (1) estimated Potential

Gross Income ("PGI"), which "is the total income attributable to real property at a full

occupancy before vacancy and operating expense[s] are deducted;" (2) estimated Effective Gross

Income ("EGI"), which is "the anticipated income from all operations of the real property after

an allowance is made for vacancy and collection losses and an addition is made for any other

income;" (3) estimated Net Operating Income ("NOI"), which is "the actual or anticipated net

income that remains after all operating expenses are deducted from [EGI] but before mortgage

debt service and book depreciation are deducted;" and (4) capitalized the Property's NOI. (Def.

Ex. L at 61) (quotations omitted).  Otteau's analysis has been employed by other appraisers who

have provided expert testimony in this Circuit. *See, e.g.*, *In re Whitney Lane Holdings, LLC*,

2009 WL 2045700, at *7 (finding that the income approach "analyzes a single year's income

expectancy at a projected stabilized income level, and then determines the present value of the

property by using an overall capitalization rate to convert it into value").  Therefore, the Court

will use Otteau's method to calculate the Property's as-is value.

**i.    Potential Gross Income**

First, Otteau estimated the Property's PGI as $6,470,250. (*See* Def. Ex. L at 55-73).  The

Court finds that this estimate is well-supported, and will rely on it.

In support of his conclusion, Otteau analyzed comparable buildings, (*see id.* at 61, 68)

(noting all buildings for the office rental comparison analysis were Class A office buildings in

good condition), reviewed additional income generated by the Property, (*see id.* at 71-71),

calculated market rent, (*see id.* at 69), and reviewed "any and all contract leases encumbering the

[Property]," including adding "market rent . . . to vacant spaces," (*id.* at 73). Otteau's analysis is consistent with his testimony, and well-supported. In particular, his analysis is based on comparable data within the Property's market area. (*See, e.g.*, *id.* at 70) (noting that "[a]ll comparable rents are located within the [Property's] general market area and considered comparable locations compared to the [Property]"). Moreover, Otteau applied the same analysis as experts in other cases. *See, e.g.*, *In re Whitney Lane Holdings, LLC*, 2009 WL 2045700, at *5 (finding persuasive an expert analysis that "conducted a market rent analysis to determine potential gross income"). Thus, the Court adopts Otteau's PGI, and finds that the Property had a PGI of $6,470,250.

ii.    **Effective Gross Income**

Second, Otteau estimated the Property's EGI as $6,788,872. (*See* Def. Ex. L at 74-75). The Court also finds this conclusion persuasive, except for some minor issues.

First, Otteau estimated the market vacancy. He determined that the Property would be 10% vacant, and therefore lose 10% of its revenue per year. (*Id.* at 74). Otteau characterized this estimation as "conservative." (Trial Tr. at 77) (defining this figure as "how much the [Property] would be vacant [and, therefore how many] tenants [will] not paying within a building at any given time"). Second, Otteau added together the different income streams generated by the Property. He took the previously-calculated PGI of $6,470,250 and added the parking income of $258,810 and tenant utility expense reimbursement of $814,131, to arrive at a total of $7,453,191.00.[14] Otteau then reduced this amount by 10% to account for market vacancy and tenant loss. Thus, his EGI is $6,788,872.

---

[14] In Plaintiffs' post-trial brief, they calculate the Property's PGI after including other income generated by the Property, including parking income. (*See* Docket No. 126 at 16). However, at trial, both Plaintiffs and Otteau characterized his "potential gross income [as] $6,470,250," and then "added in the parking income," along with "the

The Court finds Otteau's estimation of the parking income he included in the EGI unreliable. First, Otteau was unaware of some of the parking income generated by the Property. (*See* Trial Tr. at 198) (responding to questions on the Property's parking income "[m]aybe that's the case, but, I mean, I don't have those leases"). Second, Otteau tied the Property's parking income to its tenancy, which ignores how the parking income was generated. (*See* Docket No. 126 at 18-19) (Plaintiffs explain that the Property's "[p]arking income bears no relationship to the office and retail rental income because office and retail tenants do not pay for parking . . . [r]ather [it] derives from easements [and] license agreement[s]"). On the other hand, Belenky's parking estimate of $546,270 appears to be well-supported. Belenky relied on the Parking Structure Condition & Repair Report, which detailed the number of parking spaces on the Property, along with the entities who paid for parking. (*See* Pls. Ex. 4 at 23, 56). Moreover, Belenky testified that he relied on the "rent roll as of December 2020 . . . [and] confirmed with [Alexander] that nothing changed in the parking [] situation and [that] rents [we]re the same" on the day of the sheriff's sale. (Trial Tr. at 588-89). While Otteau estimated parking income by taking a percentage of the PGI, Belenky relied on the actual income from tenants, including "Hartz, Medieval Times for night use . . . Marriott Courtyard and [] Amazon." (*Id.* at 590). This better reflects the Property's parking income, since it was generated independent of its tenancy. (*See id.* at 589-93).

Since Belenky's parking estimate is better supported by the record than Otteau's, the Court will adopt Belenky's parking estimate of $546,270. (Pls. Ex. 4 at 56). Nevertheless, the Court otherwise relies on Otteau's methodology. Thus, the Court takes the PGI of $6,470,250, adds additional parking income of $546,270 and tenant utility expense reimbursement of

---

utility expense reimbursement." (Trial Tr. at 180). Thus, for consistency, the Court will characterize Otteau's figures in the same manner as he testified, which is consistent with his expert report.

$814,131, to come to a EGI of $7,830,651. Since Otteau deducted this amount by 10% for market vacancy and tenant loss, the Court will do the same. Thus, the total EGI is $7,047,585.90.

**iii.    Net Operating Income**

Third, Otteau estimated the Property's NOI as $4,060,722. (*See* Def. Ex. L at 75-80). The Court finds Otteau's analysis persuasive. However, because the Court found Otteau's EGI inaccurate, the Court must adjust Otteau's NOI accordingly. Therefore, the Court finds the Property's NOI to be $4,319,435.90.

"[T]o get from EGI to NOI . . . we have to figure out what the expenses would be in the property." (Trial Tr. at 77-78). Here, neither expert relied on the Property's data. Otteau "requested three years' historical expenses," but he "only received informal information in the form of Profit and Loss statements." (Def. Ex. L at 75). After reviewing the market, Otteau found that these Profit and Loss statements "did not match up with the market." (Trial Tr. at 79). For instance, while the Property's Profit and Loss statements showed $0.36 per square foot for "Management & Admin," Otteau could not find any market data to support this. (*See* Def. Ex. L at 77) (showing that the lowest was in the 234,351 square foot Central, NJ column for $0.37, with the average for comparable buildings at $1.25). Similarly, Belenky "did not find [the Profit and Loss statements] reliable" estimates of the Property's expenses. (Trial Tr. at 610). Thus, it was appropriate for Otteau to disregard the Property's data, and rely on local and national data to determine the NOI.

Relying on local and national data, Otteau ultimately found that the expenses for the Property total $2,728,150. (Def. Ex. L at 77). The Court finds that Otteau's NOI estimate is persuasive because it is based on a well-supported analysis of the local and national data. (*See*

*id.*).  Next, he calculated the Property's NOI by subtracting the total applied expenses of the

Property ($2,728,150) from his estimate of the EGI ($6,788,872), and concluded that the

Property's NOI is $4,060,722. (*See* Def. Ex. L at 77, 89).  Although the Court's EGI is different

than Otteau's, it finds Otteau's calculation otherwise supported.  Thus, the Court subtracts

Otteau's estimate of the total applied expenses ($2,728,150), from the Court's finding of the EGI

($7,047,585.90), and concludes that the Property's NOI is $4,319,435.90.

**iv.    Capitalization Rate**

Fourth, Otteau calculated the Property's capitalization rate ("cap rate") as 8%. (*See* Def.

Ex. L at 81-88).  For the following reasons, the Court adopts Otteau's 8% cap rate.

A cap rate is "a risk rating," or "a multiplier." (Trial Tr. at 75).  To place the cap rate in

context, "[t]he value of the property is the product of the property's expected net income divided

by a capitalization rate, which is . . . the annual rate of return necessary to attract investment

capital." *In re Menorah Congregation & Religious Ctr.*, 554 B.R. 675, 692 (Bankr. S.D.N.Y.

2016) (internal quotations and citation omitted).  Otteau testified to this effect, stating that he

teaches his students "IRV, so income, [cap] rate, valuation . . . [to] determine everything," so that

he can determine the income of a property if he knows the rate and valuation. (Trial Tr. at 75-

76).  However, here, Otteau was not provided with income, cap rate, or valuation.  Thus, he had

to estimate the Property's NOI and cap rate in order to calculate the as-is value of the Property.

Belenky also provided a cap rate, but the Court does not find his cap rate to be

persuasive.  Belenky's testimony on the cap rate focused on unsuccessfully attacking Otteau's

formula instead of helping the Court understand how Belenky supported his own estimate. (*See,*

*e.g.*, Trial Tr. at 543-45).  Moreover, Belenky failed to support his cap rate with sufficient data.

For instance, "one of [Belenky's] own comp[arable buildings] had a cap rate of 8.12 percent . . .

[but] [Belenky] chos[e] a 6.2[2] percent cap rate." (Trial Tr. at 119).  In support of his cap rate, Belenky points to a national survey that reflects the overall cap rate for suburban office markets was between 4% and 9%, averaging 6.22%. (*See* Pls. Ex. 4 at 132); (*see also* Trial Tr. at 539). Without significant analysis, Belenky adopted this average. (*See id.*).  On the other hand, Otteau provided national data supporting his cap rate, (Def. Ex. L at 83) (showing an average suburban office market cap rate of 7%), but he went further by supplementing his findings with comparable properties in the area which had cap rates averaging closer to 8%, which Otteau adopted, (*see id.* at 87).  Moreover, Belenky's attacks on Otteau's capitalization rate were ineffective.  Belenky argues that Otteau improperly relied on Secondary Office data in computing his cap rate. (Trial Tr. at 538-40).  However, Otteau relied on three different pieces of data to support his cap rate. (Def. Ex. L at 84-87) (relying on average bond yields, national and local average capitalization rates, and the Band of Investments technique).  Belenky also attacked Otteau's reliance on comparable sales data, which showed cap rates ranging from 7% to 8.12%, (*see id.* at 88), but the difference between their analyses boils down to a credibility determination, and the Court finds Otteau's analysis and testimony more persuasive because it was well supported. *See State of New York v. Solvent Chem. Co.*, No. 83-CV-1401C, 2006 WL 2640647, at *1 (W.D.N.Y. Sept. 14, 2006) ("[I]t is the duty of the court conducting the bench trial to assess and weigh the credibility of all expert witnesses.").

Otteau addressed the fact that "a lot of people feel the cap rate can be speculative" by explaining in detail how he supported his cap rate. (Trial Tr. at 80).  First, Otteau gathered data, finding "it important to [] have at least three sources" to develop his cap rate. (*Id.*).  Otteau relied on: (1) average bond yields, because "funds for real estate investment are competing with these alternative investments," (Def. Ex. L at 81); (2) national and local average capitalization rates, as

they are sound comparators, (*id.* at 82-83); and (3) the Band of Investments technique, which compiles different rates, such as the loan-to-value ratio, to calculate the cap rate, (*id.* at 84-87). Second, before making his final determination, Otteau made a positive adjustment for the Property, lowering the cap rate slightly to "give [the Property] credit for [its prior owners] paying their mortgage over the term." (Trial Tr. at 81). Instead of giving the Property an 8.5% cap rate, which the data would have supported, Otteau gave it an 8% cap rate. (Def. Ex. L at 88-89).

Since it is well-supported by the record, the Court adopts Otteau's 8% cap rate.

**v.        Entrepreneurial Profit**

The Court will not adopt Otteau's addition of entrepreneurial profit to the as-is value calculation of the Property.

Otteau testified that entrepreneurial profit reflects the cost "anybody would require to have to go through the process of . . . repair[ing]" a property. (Trial Tr. at 215-16). The entrepreneurial profit realizes that "[i]n order for someone to [purchase a property], they have to be able to profit from it in some way." (*See id.*). Put another way, it is a "risk rating" to capture the level of uncertainty associated with a property purchase that requires an investor to develop the property post-purchase. (*Id.* at 216-17). Belenky provided a clearer distinction, testifying that he would apply entrepreneurial profit if a buyer were to convert the Property's zoning and construct apartments. (*Id.* at 585-87, 690-92). However, as the Court explained, *see supra* Section III.B, the fair market value of the Property at the time of the sheriff's sale does not capture speculative, forward-looking value. Moreover, the record is devoid of credible evidence that entrepreneurial profit should be included in the Property's fair market value at the time of the sheriff's sale. Therefore, it would be inappropriate to apply entrepreneurial profit to the as-is valuation, and the Court will not do so. *Hyman*, 927 F.3d at 661-62 (holding that a court may

accept part of an expert report while discrediting other parts of the same). Thus, the Court rejects Otteau's addition of entrepreneurial profit.

**vi.    Converting As-Stabilized to As-Is[15]**

To arrive at the as-stabilized value—a prerequisite to calculating the as-is value of the Property—Otteau divided the NOI by his 8% cap rate. (Def. Ex. L at 89). Since the Court has found the Property's NOI to be $4,319,435.90, when divided by the 8% cap rate, it yields an as-stabilized value of $53,992,948.75. Thus, the Court finds the Property's as-stabilized value is $53,992,948.75.

To convert the as-stabilized to an as-is value, Otteau subtracted some of the prospective assumptions he made during his prior calculations. For instance, Otteau applied market rent for vacant spaces to determine the Property's PGI, but needed to adjust this figure downward to reflect the Property's value at the time of the sheriff's sale. Thus, he subtracted the entire PGI from his as-stabilized value. (*See* Def. Ex. L at 89). While this appears to conflict with the fact that the Property had tenants who were paying rent, on cross-examination, Otteau provided a thorough explanation for this decision. (*See* Trial Tr. at 199-201, 205-06). He explained that to secure a tenant, the Property must spend money to advertise the space, entice tenants with discounted rents, and wait at least a few months for a tenant to join the building. (*See id.*). Thus, Otteau usually deducts 1.5 times the PGI from the Property's as-stabilized value to arrive at the as-is value. (*See id.* at 201). In addition, Otteau realized that there would be turnover in the short-term, given that some tenants were occupying only half of their space, or moving out completely. (*See id.* at 202-03). Therefore, Otteau remained "conservative" and deducted only

---

[15] Both experts agree that calculating the as-is value of the Property requires an antecedent estimation of its as-stabilized value. Otteau estimated the Property's as-stabilized value, and then made several "deduct[ions] to get from [his] as-stabilized to [his] as-is value." (Trial Tr. at 150, 199-201, 613). "[I]n getting from the as-stabilized value to the as-is value," Belenky and Otteau's "methodology was essentially the same." (Trial Tr. at 614).

one year of PGI. (*Id.* at 201).  The Court finds Otteau's analysis persuasive, and will deduct one year of PGI from the Property's as-stabilized value to arrive at its as-is value.

Otteau also added income derived from the remaining lease term of a cell tower located on top of the Property. (Def. Ex. L at 90-91).  While Belenky included this data into the Property's NOI, Otteau explained that fast-paced technological advances have decreased lenders' willingness to lend based on the value of this asset. (Trial Tr. at 88).  For this reason, Otteau simply added the value of the remaining lease term for the cell tower to his as-is value. (*See id.*) (explaining that "the bank . . . value[s] [cell towers] separately . . . [i]t does not go into your overall net operating income for the property").  The Court notes that Otteau and Belenky's estimates of the income from the cell tower were very close, (*see* Docket No. 126 at 16), and adopts Otteau's estimation of the cell tower's income since he clearly explained the basis for his valuation.  Thus, the Court will add the cell tower's income of $323,000 to its as-is valuation.

Finally, Belenky disagreed with Otteau on some other adjustments, including the Fit Up Adjustment. (*Compare* Def. Ex. L at 89 *with* Pls. Ex. 4 at 57).  The Fit Up Adjustment estimates the cost of transforming a space for a new tenant to meet their needs. (Trial Tr. at 161-62). Based on data from PricewaterhouseCoopers showing the cost to be $48.75 per square foot, Otteau calculated the Fit Up Adjustment at $45 per square foot for a total of $10,616,625. (Def. Ex. L at 88-89).  Relying on the same data, Belenky found the Fit Up Adjustment to be $30 per square foot. (Pls. Ex. 4 at 57).  Initially, Belenky had the number at $25, but testified that he changed it because he is "open to criticism." (*See* Trial Tr. at 574-76).  The Court does not find Belenky's estimate persuasive.  The Court finds Otteau's estimate more persuasive, as it is far closer to the PricewaterhouseCoopers' average that both experts relied on to reach this figure. (*See* Trial Tr. at 571-74).  For similar reasons, the Court finds that Otteau's estimation of Vacant

Expense Loss ($814,131) and Leasing Commissions ($1,470,554) are credible, and his expert

opinion for these estimates was persuasive.  Therefore, the Court adopts Otteau's estimates for

the Property's Vacant Expense Loss and Leasing Commissions.

**vii.**     **Final Calculations**

In calculating the as-is value of the Property at the time of the sheriff's sale, the Court

relies on Otteau's methodology, but uses numbers based on its factual findings.  Belenky

conducted a very similar calculation. (*See* Trial Tr. at 569).  To finalize its calculation of the as-is

value of the Property, the Court begins with the as-stabilized value ($53,992,948.75), subtracts

one year of PGI ($6,470,250), and related costs of Vacant Expense Loss ($814,131), Leasing

Commissions ($1,470,554), and Fit Up Adjustment ($10,616,625), and adds cell tower income

($323,000), to arrive at an as-is value of $34,944,388.75.

Accordingly, the Court finds the as-is value of the Property as of the date of the sheriff's

sale, June 11, 2021, to be $34,944,388.75.

**D.**     **Plaintiffs' Remaining Debt to Defendant**

The parties agree that Plaintiffs are liable to Defendant for the remaining principal on the

Note, (*compare* Docket No. 126 at 2 *with* Docket No. 125 at 8-9), which the Court found to be

$36,523,158.12, *See supra* Section III.A.  The parties also agree that Plaintiffs are entitled to a

fair market value credit. (*See id.*).  This is consistent with well-established New Jersey law. *See*

*W. Pleasant-CPGT, Inc. v. U.S. Home Corp.*, 243 N.J. 92, 95 (2020) ("Consideration of fair

market value credit has a role in preventing windfalls to creditors when a creditor forecloses on

property and pursues a deficiency claim.").  Therefore, the Court subtracts the as-is value of the

Property at the time of the sheriff's sale ($34,944,388.75), from Plaintiffs' debt to Defendant

($36,523,158.12), and concludes that Plaintiffs are jointly and severally liable to Defendant in the amount of $1,578,769.37.

## E.    Defendant's Attorney's Fees

Defendant requests attorney's fees in the amount of "$110,000 to Weir Associates [and] $66,154.00 to Price Meese Shulman and D'Arminio, P.C. for a total of $176,154.00 as of January 8, 2024," and "[a]dditional attorneys' fees" thereafter "until the debt is paid in full." (Docket No. 125 at 9-10).  Defendant maintains that it is entitled to attorney's fees for this action because the Note clearly expresses the parties' intent that attorney's fees would not be barred by the Final Judgment in the Foreclosure Action. (*Id.* at 13).  Plaintiffs concede the Final Judgment did not bar Defendant from seeking attorney's fees for this action, but argue that Defendant is not entitled to attorney's fees because it failed to submit proper evidence in connection with a fee award after the Court expressly ordered it to do so. (Docket No. 118 at 11-12).

"As a threshold matter, the party seeking fees must provide accurate, detailed and contemporaneous attorney time records." *Beadle v. Forever Jerk LLC*, 23 CV 9166 (NCM)(RML), 2024 WL 3813374, at *9 (E.D.N.Y. July 31, 2024).  "[A]ttorneys are required to keep and submit contemporaneous records with their fee applications, absent unusual circumstances outside the attorney's control." *Restivo v. Hessemann*, 846 F.3d 547, 591 (2d Cir. 2017).  In fact, there are "no examples in this Circuit of attorneys receiving fees in cases in which they had failed to provide at least some contemporaneous records." *Scott v. City of New York*, 643 F.3d 56, 58 (2d Cir. 2011).  "This Circuit requires contemporaneous billing records for each attorney." *Gu v. Lemonleaf Thai Rest. Mineola Corp.*, CV 18-6614 (PKC)(AYS), 2024 WL 3813379, at *9 (E.D.N.Y. June 13, 2024).  Exceptions to this rule are "rare." *Scott*, 643 F.3d at 59.

The Court has wide discretion to award attorneys' fees, even where the party seeking such fees does not timely submit proper evidence. *See, e.g.*, *VR Optics, LLC v. Peloton Interactive, Inc.*, No. 16-CV-6392 (JPO), 2021 WL 1198930, at *1 (S.D.N.Y. Mar. 30, 2021) (granting a motion for attorney's fees where the movant "failed to provide evidence regarding its damages in discovery or in support of its motion for summary judgment" on which it prevailed), *aff'd*, 2023 WL 2031213 (Fed. Cir. Feb. 16, 2023).  However, courts generally decline motions for attorney's fees where counsel had multiple opportunities to submit evidence supporting their motion, and failed to do so. *See Schuster v. Dragone Classic Motor Cars*, No. 99 Civ. 2163 (LAK), 2000 WL 1585685, at *2 (S.D.N.Y. Oct. 25, 2000) (denying an attorney fee award where the party had two opportunities to submit proper evidence but did not).

The Court directed Defendant to submit evidence if it wanted the Court to consider its application for attorney's fees. (*See*, Minute Entry, March 7, 2024) (ordering Defendant to "specifically address[] . . . why they are entitled to *each category* of fees they are requesting") (emphasis added).  Defendant has not submitted any supporting documentation for its attorney's fees request, let alone "accurate, detailed and contemporaneous attorney time records." *Beadle*, 2024 WL 3813374, at *9.  While Defendant mentions attorney's fees in its post-trial briefing, maintaining that it is entitled to "$110,000 to Weir Associates + $66,154.00 to Price Meese Shulman & D'Arminio, P.C. for a total of $176,154.00 as of January 8, 2024," and "[a]dditional attorneys' fees . . . until the debt is paid in full," (Docket No. 125 at 9-10), it fails to attach any supporting records.  In fact, Defendant does not provide contemporaneous time records despite the fact that the Court specifically instructed it to do so at the March 7, 2024 Final Pretrial Conference.  The record is completely devoid of anything indicating the amount of hours or type

of work performed.  As a result, the Court cannot evaluate the reasonableness of Defendant's request for attorney's fees.

Accordingly, the Court denies Defendant's request for attorney's fees.

## F.    Interest

Defendant is entitled to pre-judgment and post-judgment interest.  First, "[i]n a diversity case, state law governs the award of prejudgment interest." *Jamil v. Solar Power Inc.*, 230 F. Supp. 3d 271, 277 (S.D.N.Y.) (citing *Schipani v. McLeod*, 541 F.3d 158, 164 (2d Cir. 2008)). Under the Final Judgment, pre-judgment interest accrues at the "lawful interest" rate after January 7, 2021. (Pl. Ex. 1 at 3).  Thus, Defendant is entitled to pre-judgment lawful interest under New Jersey Rules of Court 4:42-11(a) from the day after the sheriff's sale, to the date the Clerk of Court enters judgment in this action.[16] *See Avatar Cap. Fin., LLC*, 2022 WL 1495919, at *2.

Second, federal law governs post-judgment interest. *Cappiello v. ICD Publications, Inc.*, 720 F.3d 109, 112 (2d Cir. 2013) ("[T]he federal post-judgment interest rate provided for in 28 U.S.C. § 1961 applies in diversity cases.").  "[T]he Court may only award post-judgment interest at the rate set forth in 28 U.S.C. § 1961(a)." *K&S Produce, Inc. v. SY 44 Food Corp.*, 20-CV-9663 (JPC), 2021 WL 2333860, at *1 (S.D.N.Y. May 27, 2021).  Therefore, Defendant is entitled to post-judgment interest at the rate set forth in 28 U.S.C. § 1961.

## IV.    CONCLUSION

For the foregoing reasons, the Clerk of Court is respectfully requested to enter judgment for Defendant and Counterclaim-Plaintiff Polito Associates LLC on its counterclaim against

---

[16] *See* N.J. Ct. R. 4:42-11(a)(ii); *see also* POST-JUDGMENT AND PRE-JUDGMENT INTEREST RATES, (https://www.njcourts.gov/sites/default/files/courts/civil/postprejudgmentrates.pdf), (last visited September 19, 2024).  The interest rate: in 2021 was 1.5%; in 2022 was 0.25%; in 2023 was 0.25%; and in 2024 was 3.50%. *Id.*

Plaintiffs and Counterclaim-Defendants David Ekstein, Sara Ekstein, Gavriel Alexander, and Counterclaim-Defendant 9 Polito LLC, jointly and severally, in the amount of $1,578,769.37.

The Clerk of Court is further directed to calculate pre-judgment interest as described herein from June 12, 2021 to the date the Clerk of Court enters judgment.

Post-judgment interest will commence when the Clerk of Court enters judgment and continues until the date of payment.

The Clerk of Court is respectfully requested to close the case.

Dated:   September 19, 2024
              White Plains, New York

**SO ORDERED:**

JUDITH C. McCARTHY
United States Magistrate Judge